Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued  September  16,  2003          Decided  July  6,  2004

No. 02-1266

PEARSON EDUCATION, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES,
INTERVENOR

———

Consolidated with
02–1324

———

On Petition for Review and Cross–Application for
Enforcement of an Order of the
National Labor Relations Board

———

*Gregory J. Utken* argued the cause and filed the briefs for petitioner.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Robert J. Englehart*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Aileen A. Armstrong*, Deputy Associate General Counsel. *James M. Oleske, Jr.*, Attorney, entered an appearance.

*Barry A. Macey* argued the cause and filed the brief for intervenor.

Before: SENTELLE, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Pearson Education, Inc., ("Pearson" and "the company") petitions for review of the National Labor Relations Board ("the Board" or "NLRB") decision following our remand in *Macmillan Publishing Co. v. NLRB*, 194 F.3d 165 (D.C. Cir. 1999). After remand, the Board reaffirmed its initial decision setting aside the first election then certifying the Union of Needletrades, Industrial and Textile Employees of the AFL–CIO ("the union") as the collective bargaining agent based on a second, otherwise uncontested, election. Pearson refused the union's demand for bargaining. The Board entered a bargaining order. Pearson now petitions for review, and the Board cross-petitions for enforcement of its order. For the reasons more fully set out below, we deny the company's petition for review and allow the Board's cross-petition for enforcement.

## I. Background

Pearson distributes and sells reference materials and educational books. In 1997, the company—then Macmillan Publishing, Inc.—operated two distribution warehouses in Indianapolis: one at Northwest Boulevard and one at Rockville Road. In June of that year, the union petitioned the Board to represent "all full-time and all regular part-time warehouse and distribution center employees" at both facilities. Because the company planned to consolidate and transfer its opera-

tions to Lebanon, Indiana, it argued that holding an election would not effectuate the purposes of the National Labor Relations Act ("the Act"). The NLRB's Regional Director found that the intended relocation did not render an immediate election inappropriate and ordered an election.

The Board denied the company's Request for Review of the Regional Director's Decision and Direction of Election. The union held the election in August. The initial results revealed a sufficient number of challenged ballots to affect the results of the election, and the Regional Director ordered that a hearing be held to resolve the status of the challenged ballots. While the election's outcome was unknown, the union filed eight objections to the election and the company filed four. The Regional Director shelved these objections pending determination of the election's outcome.

Two weeks prior to the first election, the company had announced an hourly-wage increase of $1.10—and later $1.25—in connection with the move to Lebanon. One week before the election the company distributed a leaflet stating:

> WHAT DO YOU HAVE TO LOSE? How about: $2,522.00 next year! . . . Without a union, Macmillan will be free to proceed ahead with the announced wage increases for the Lebanon move. With a union, since all wages and benefits would be subject to negotiation, no one can predict what the final package would be. WHY TAKE THE RISK? VOTE NO! (emphasis in the original).

When the company won the election by three votes, it withdrew its objections and the Regional Director—without passing on the rest of the union's objections—found that the company had circulated an improper leaflet to employees. The union claimed the flyer "threaten[ed] employees with the loss of the promised wage increase . . . if they selected the union as their bargaining representative."

The Regional Director sustained this objection. He explained that during a union campaign, "an employer should decide the question of granting or withholding benefits as it

would if a union were not in the picture." Further, he stated that the leaflet "violates this principle by leaving it in the minds of the employees that they will lose the previously announced raise . . . if the union is voted in." The Regional Director concluded that the company's "mention, later in the document (in much smaller print) that all wages and benefits are subject to negotiation does not cure the clear implication that the employees will not get their promised raise if the union is voted in." The Board denied the company's request for review of the Regional Director's decision.

The union won the second election in June 1998, by six votes. The company filed objections challenging the Regional Director's previous decision raising issues that had already been reviewed by the Board. The Regional Director denied the objections and certified the union as the collective bargaining representative. The Board again denied the company's request for review of the Regional Director's decision.

After the Board certified the union, the company refused to bargain or provide the union with requested information. The union charged that the company was engaging in unfair labor practices in violation of Section 8(a)(5) and (1) of the Act. 29 U.S.C. § 158(a)(5) and (1). On October 30, 1998, the Board issued a Decision and Order finding that the company had violated the Act as charged.

This Court reviewed the Board's original decision in *Macmillan Publishing Co. v. NLRB*, 194 F.3d 165 (D.C. Cir. 1999). There, the company argued both that the first election was premature, and that the Regional Director improperly overturned the first election because of the flyer.

We held that the company could not successfully challenge the order on the ground that the first election was premature because of the impending transfer to a new facility. The Board's bargaining order resulted from the second election, which the union won, not the first election, which the union lost. The company's move to Lebanon had already taken place by the time of the second election. Indeed, the Regional Director's predictive judgment before the first election—that the workforce at the old locations would be a substantial

and representative complement of the workforce at the new location—had proved accurate. *Id.* at 166.

However, we held that the Regional Director's decision to overturn the results of the election—on the basis of the flyer—did not rest on sound legal principles, and thus was arbitrary and capricious. *Id.* at 168. Rather than citing to Board authorities discussing the issue of when employer communications during union election campaigns are threatening and coercive, the Regional Director instead relied on the concept that an employer should act as if a union were not in the picture. We held that no such principle governs employer communications during such elections. *Id.*

On remand, the Board ordered a hearing before an Administrative Law Judge ("ALJ") on all of the union's objections to the first election. At the hearing the union stated that it was prepared to go forward on only four of the original eight objections.

After a three-day hearing, the ALJ issued a decision recommending that the Board sustain three of the union's four objections, set aside the first election, and reaffirm the union's certification based upon its success in the second election.

On review, the Board affirmed the ALJ's decision to set aside the results of the first election and—based upon the union's second election victory—reaffirmed its certification of the union and ordered the company to bargain. *Pearson Education, et al.*, 336 NLRB No. 92 (2001) (the "Decision and Order"). The company moved to reconsider the appropriateness of the bargaining unit, which the Board denied. This petition for review followed.

## II. Analysis

### A. The Company's Leaflet

The company's central claim is that the union's certification was invalid because the Board abused its discretion in setting aside the first election. Indeed, the company does not dispute the outcome of the second election, which the union won.

Therefore, unless the company prevails in its assertion that the Board improperly set aside the results of the first election, the Board's certification of the union was valid and the company's refusal to bargain with the union violates sections 8(a)(5) and (1) of the Act. 29 U.S.C. § 158(a)(5) and (1). *See Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 (D.C. Cir. 1993); *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 881–82 (D.C. Cir. 1988).

Our review of Board decisions is deferential, and we have specifically held that judicial review of a Board decision for a rerun of an election is "extremely limited." *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1176 (D.C. Cir. 1987) (citation omitted). The legal principles governing the sort of conduct here alleged are clear and well-settled: the Board will sustain an objection to a party's statements or conduct during an election when the challenged actions had a reasonable tendency to interfere with employee free choice. *See NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 (6th Cir. 1988). Further, the Board reasonably finds that employee free choice has been compromised when the election is tainted by conduct or statements that "tended to interfere substantially with the ability of the employees to make a free and rational choice in the election." *General Dynamics Corp.*, 250 NLRB 719, 719 (1980) (citations and internal punctuation omitted). *See also Macmillan Pub'g. Co.*, 194 F.3d at 168.

In sum, the issue before the Board was whether an employer's threats or statements had a reasonable tendency to interfere with the free exercise of employee rights under the Act. *S.W. Reg'l. Joint Bd., Amalgamated Clothing Workers v. NLRB*, 441 F.2d 1027, 1031 (D.C. Cir. 1970).

In our prior review of this case, we found that the Regional Director, whose decision the Board refused to review, did not engage in the required reasoned decisionmaking. We specifically addressed the Regional Director's conclusion that the flyer violated the "principle" that an employer should act as "if a union were not in the picture." *Macmillan Pub'g. Co. v. NLRB*, 194 F.3d at 168. However, as we held, "[t]here is no such principle governing employer communications during

election campaigns, and we doubt that there could be in light of the First Amendment." *Id.* Because of this defect, we found that the Board's decision reflected a classic case of lack of reasoned decisionmaking. *Id.* (The "rationale was the antithesis of reasoned decisionmaking, and as such was arbitrary and capricious.") (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). We hold that this defect has now been cured.

The Board correctly found that the company's leaflet, circulated several days before the election, threatened to withhold a promised wage increase if the union won the election, and set aside the results of the first election. The Board then certified the union as the bargaining representative of the unit employees based on the employees' vote in favor of union representation in the second election. If the Board's decision as to the first election was correct, the second follows without challenge. It was correct.

The settled law is clear: to state that a previously-announced wage increase will probably be lost if a union wins constitutes employer coercion. *See Flamingo Hilton–Laughlin*, 324 NLRB 72, 111 (1997), *enforced in relevant part*, 148 F.3d 1166, 1175 (D.C. Cir. 1998). Here, just days after the company announced a ten-percent wage-increase, and just days before the election, the company distributed a campaign flyer that threatened that the increase, amounting to "$2,522.00 next year," was "WHAT . . . YOU HAVE TO LOSE if the Union wins the election." As the Board emphasized, the flyer "explicitly states that the promised wage increase will be put in jeopardy if the employees choose the Union." We agree with the Board that this constitutes classic coercive conduct. *See Pepsi–Cola Bottling Co.*, 315 NLRB 882, 892–93 (1994), *enforced in relevant part*, 96 F.3d 1439 (4th Cir. 1996). And petitioner's arguments to the contrary are unavailing.

The flyer states that "[w]ithout a Union, [the Company] will be free to proceed ahead with the announced wage increases for the [upcoming] move," but "[w]ith a union, since all wages and benefits would be subject to negotiation, no one can

predict what the final wage package will be. WHY TAKE THE RISK?" We agree with the Board's conclusion that the language "leaves the clear impression that if the employees choose the union, 'what they may ultimately receive depends upon what the union can induce the employer to restore.'" As the Board indicated, this is coercive conduct because it "sends the clear message that, in the absence of the Union, the Company is willing to grant the raise, but if the Union wins the election, the Company will pay only what the Union can force it to pay." *See NLRB v. Saunders Leasing System, Inc.*, 497 F.2d 453, 457 (8th Cir. 1974) ("Express threats to bargain from scratch and withdraw benefits during negotiations can carry in themselves their own seeds of coercive threats."); *NLRB v. Aerovox Corp.*, 435 F.2d 1208, 1211–12 (4th Cir. 1970).

A promised raise must be awarded even if a union wins an election. *See Advo System Inc.*, 297 NLRB 926, 940 (1990); *Arrow Elastic Corp.*, 230 NLRB 110, 113, *enforced*, 573 F.2d 702 (1st Cir. 1978). Although the union here could legally bargain away the raise, as the Board emphasized, "that is not what the leaflet says." We agree with the Board's conclusion that "[t]he message of the leaflet is that the Union would have to bargain to get the employees the raise, and this is simply not true."

Because we agree with the Board that the company's distribution of the leaflet was objectionable conduct "independently sufficient to set aside the election," we do not need to reach the additional allegations of objectionable conduct by the company.

*B. Changed Circumstances*

We turn briefly to petitioner's assertion that the Board erred in rejecting its arguments on changed circumstances. The company contends that there are a number of changed circumstances that render the certified unit of "warehouse and distribution center" employees at the Lebanon, Indiana facility no longer appropriate. The company asserts that since the Regional Director originally designated the bargaining unit in 1997, circumstances have changed substantially

and dramatically, compelling the result that the unit is no longer appropriate. But with the exception of all but a few, the company's "changed circumstances" were brought to the attention of this Court before, when the company argued that these very same changes required dismissal of any election petition until the company had completed the changes. These changes include incorporation at the Lebanon facility of various satellite operations, changes to work procedure, and changes to technologies used by bargaining-unit employees. We again agree with the Board that the company's alleged changed circumstances are the same ones the company asserted when it argued the prospective changed circumstances required dismissal of any election petition until it had completed the changes. And apart from this recycled catalog of superficial differences, changes in ownership and post-election employee turnover are—on their own—each insufficient grounds to render a certification no longer appropriate.

The company rightly points out that in November 1998, Macmillan was sold to Pearson. However, as the Board noted in denying the company's motion for reconsideration, mere change of employers or of ownership is not such an unusual circumstance as to affect the force of certification by the Board within the normal operative period if the majority of employees after the change of ownership were employed by the preceding employer. The company makes no allegation that only a minority of employees employed in the bargaining unit after the change of ownership had been employed by the company prior to the change.

The company's emphasis on the employee turnover that has occurred since this Court first reviewed and remanded the Board's certification of the union is similarly unavailing. Indeed, as the Board noted in denying the company's motion for reconsideration, "it is well settled that post-election turnover is an insufficient ground to set aside an election." *See Avis Rent–A–Car System, Inc.*, 285 NLRB 1032, 1033 (1987), *enforced mem.*, 849 F.2d 599 (3d Cir. 1988). We have recently held that apart from bargaining orders that arise in the *Gissel* context, turnover is not something that affects the ongoing validity of Board bargaining orders. *Scepter, Inc. v.*

*NLRB*, 280 F.3d 1053, 1057 (D.C. Cir. 2002) ("The simple fact of employee turnover . . . would not, without more, have been enough to require a different decision by the Board.").

Lastly, although the company asserts that since the second election the entire workforce has doubled, it is unclear whether the relevant bargaining unit has changed in size at all. Regardless, even a doubling in the size of the bargaining unit is not the kind of change that alters the ongoing validity of a Board certification. We thus find no changed circumstances that render the certified unit inappropriate.

## III. Conclusion

For the reasons set forth above, we deny the petition and uphold the Board's decision sustaining the results of the second election.